1

1      IN THE UNITED STATES DISTRICT

2      FOR THE WESTERN DISTRICT OF TENNESSEE

3      WESTERN DIVISION

4      ================================================

5

6   FRIENDS OF GEORGE'S, INC.,

7              Plaintiff,

8   vs.                              NO. 2:23-cv-02163-TLP

9   THE STATE OF TENNESSEE; BILL LEE,
    in his official and individual
10  capacity as Governor of Tennessee;
    JONATHAN SKRMETTI, in his official and
11  individual capacity as the Attorney
    General of Tennessee,
12
               Defendants.
13  _____

14

15

16             ORAL ARGUMENT HEARING

17      BEFORE THE HONORABLE THOMAS L. PARKER

18             Thursday

19           30th of March, 2023

20

21

22

23
             CANDACE S. COVEY, RDR, CRR
24               OFFICIAL REPORTER
             FOURTH FLOOR FEDERAL BUILDING
25            MEMPHIS, TENNESSEE 38103


             UNREDACTED TRANSCRIPT

2

1            A P P E A R A N C E S

2

3

Appearing on behalf of the Plaintiff:

4

            MR. BRICE TIMMONS
5           MS. MELISSA STEWART
            MR. CRAIG EDGINGTON
6           Donati Law, PLLC
            1545 Union Avenue
7           Memphis, TN 38104

8

9

Appearing on behalf of the Defendants:

10

            MR. JAMES NEWSOM, III
11          MR. ROBERT WILSON
            MR. STEVEN GRIFFIN
12          Office of the Tennessee Attorney General
            40 South Main Street
13          Suite 1014
            Memphis, TN 38103

14

15

 Also Present:

16

            MR. STEVEN MULROY
17          MS. JESSICA INDINGARO

18

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

```
 1                        Thursday

 2                     March 30, 2023

 3          The Oral Argument hearing in this case began on this

 4     date, Thursday, 30th day of March, 2023, at 3:30 p.m., when

 5     and where evidence was introduced and proceedings were had as

 6     follows:

 7                    ----------------------

 8

 9          THE COURT:  Good afternoon.  This is in the

10     matter of Friends of George's, Incorporated against the State

11     of Tennessee and Jonathan Skrmetti.  And then I believe we've

12     got a second one, Friends of George's, Incorporated versus

13     Steven J. Mulroy.

14               Do we have someone here from the district

15     attorney's office?

16          MR. MULROY:  Your Honor.

17          THE COURT:  Oh, Mr. Mulroy.

18          MR. MULROY:  Yes.  Good afternoon.

19          THE COURT:  Good afternoon.

20          MR. MULROY:  With me is, for counsel, Jessica

21     Indingaro from my office as well.

22          THE COURT:  Very good.  Good afternoon.

23          MS. INDINGARO:  Good afternoon.

24          THE COURT:  All right.  The plaintiffs are

25     seeking a TRO.  So why don't I hear from you.
```

UNREDACTED TRANSCRIPT

4

1        **MR. TIMMONS:**  Your Honor, as a preliminary

2   matter, I think we're technically here on a preliminary

3   injunction because everybody has notice, and everybody is

4   here.  So there isn't an issue of a lack of notice that would

5   place the limits of a TRO on this hearing.  That said, we'll

6   get to the meat of it because the standards are basically the

7   same.

8        But about the law that we are dealing with here

9   today, the challenge statute.  Every year for decades now,

10  our community has been host to an event that celebrates the

11  Tennessee values of inclusion, diversity and taking pride and

12  joy in our community.  And at that festival every year for

13  many years now, you would find female impersonators, men in

14  women's attire.  The entertainment ranges from the family

15  friendly to sometimes the downright raunchy.

16       Every year this event includes performances that

17  include what would fall under the statute in question as

18  simulated sexual acts and frankly, simply perverse behavior

19  that is certainly not appropriate for young children and some

20  would argue not even for 17-year-olds.

21       Some people even believe that these performances

22  are intended to groom and recruit children to the lifestyle

23  that this event promotes.  I speak, of course, of -- if we

24  can.  That's it.  The Memphis international barbecue

25  festival's Miss Piggy Idol.

UNREDACTED TRANSCRIPT

```
1              Every single one of these performers -- and then
2    if you'll look here, some of them are pretty bad -- are
3    engaging in precisely the type of -- that one is particularly
4    awful -- are engaging in a type of conduct that would be
5    swept up in Tennessee Code Annotated 7-51-1407, the statute
6    that the State of Tennessee seeks to implement this Saturday.
7    It would render Miss Piggy Idol as it has historically been
8    conducted criminal.  And would probably put a big damper on
9    barbecue fest this year.
10             Now, we all know that that's not what the
11   legislature intended, and that's kind of the point.  What the
12   legislature did intend is to criminalize exactly the conduct
13   seen at Miss Piggy Idol when it is performed by a specific
14   group of speakers, and that is to say drag queens.
15             The statute is not content neutral.  It's
16   viewpoint discriminatory, and as my previous example
17   demonstrates, it's vague and overbroad.  All statutes that
18   are content -- that are not content neutral and that are
19   viewpoint discriminatory are presumptively unconstitutional
20   under Reed versus the Town of Gilbert.
21             Every case I'm going to cite today is a United
22   States Supreme Court case.  None of this is limited to the
23   Sixth Circuit, and none of it is particularly nuanced.  So
24   far the government has made virtually no defense to the
25   statute itself, and they focus solely on issues of standing,
```

UNREDACTED TRANSCRIPT

1   immunity and redressability.

2          Standing is, of course, the first question the

3   Court has to answer.  But in the First Amendment context,

4   that's easy.  For nearly the entire modern history of First

5   Amendment jurisprudence, the Supreme Court has recognized

6   that any individual may make a facial challenge to a speech

7   regulation.  And even where the facial challenge fails, an

8   as-applied challenge could still be brought by an

9   organization consisting of and representing performers whose

10  conduct might be criminalized by the statute.

11         Friends of George's is such an organization.  It

12  consists of performers and the production crew of drag shows,

13  that is to say, male and female impersonators.  Their

14  performances or performances that they might wish to put on

15  are due to their status as male and female impersonators,

16  either intrinsically criminalized by the statute under one

17  reading or subjected to far broader regulation and enhanced

18  punishments under another reading of the statute.  Both of

19  those interpretations are constitutionally impermissible.

20         If Friends of George's does not have standing to

21  challenge this statute, then courts would necessarily have to

22  wait for an as-applied challenge to take up any facial

23  challenge.  And the entire history of First Amendment

24  jurisprudence tells us that is not the case.  Our briefs cite

25  three key precedents on this point:  Broadrick versus

7

1   Oklahoma.  Dombrowski versus Pfister.  And Secretary of

2   Maryland versus Joseph H. Munson Company.

3          All of these cases state unequivocally that

4   facial challenge of this nature may be brought by anyone at

5   all.  And Munson Company delves into why an organization like

6   Friends of George's would have standing to bring suit under

7   the third party standing doctrine of jus tertii standing.

8   Even if the standard proposed by the government today is, in

9   fact, the correct standard.

10          So Friends of George's is the proper plaintiff.

11  And that brings us to the question of who is the proper

12  defendant.  We've addressed those issues in our briefs, but

13  in short, we are going to concede today that the state itself

14  is not subject to Eleventh Amendment abrogation under this

15  legal theory and consent to its dismissal.  The Sixth Circuit

16  decided a case in 2022 that if it didn't hold that exactly,

17  it was very, very close to doing so.

18          **THE COURT:**  So can we say good-bye to half the

19  lawyers in this room?

20          **MR. TIMMONS:**  Unfortunately, I don't know if you

21  can say good-bye to any of the lawyers in this room because

22  that's just the State of Tennessee itself.

23          **THE COURT:**  I see.  Okay.

24          **MR. TIMMONS:**  The governor -- and to be clear

25  state officials are stripped of their immunity under Ex parte

1    Young.  And the single best discussion of Ex parte Young that

2    I've seen in the Sixth Circuit recently is the one that ends

3    up in a case cited and relied on most heavily by the

4    defendants, the Universal Life Church case cited in their

5    briefs.  We've also included reference to it in ours.

6              The case deals specifically with the immunity

7    of -- and justiciability issues related to the governor, the

8    attorney general and district attorneys in the State of

9    Tennessee in their official and individual capacities.  It's

10   essentially dispositive, except for one small detail.

11             That case was not a facial challenge to an

12   overbroad statute that sought to regulate speech.  And as a

13   result of that, I think the prudential concerns that relate

14   to the justiciability issues as to the governor and the

15   attorney general would be similar to the prudential concerns

16   that I just discussed for the purposes of standing.

17             And so here, the governor has made public

18   statements, and we've cited to them directly in our briefs

19   and filed the news articles in which they're quoted.  That

20   would lead a reasonable person to believe that he will use

21   his power to command state-level law enforcement agencies in

22   Tennessee to enforce Section 1407, the challenge statute.

23             **THE COURT:**  What power does he have to do that?

24   I didn't see a citation to any examples or any statute or

25   constitutional...

1          **MR. TIMMONS:**  Well --

2          **THE COURT:**  Help me with that.  Go ahead.

3          **MR. TIMMONS:**  Sorry.  So he is the -- it falls

4    under his take care power.  But he does command the state

5    police forces, the Tennessee Bureau of Investigation, the

6    Tennessee Highway Patrol.  He appoints them and he directs

7    them and can issue executive orders relative to them.  The

8    fact that he has said that this specific statute is one that

9    he wants to see enforced would lead one to believe reasonably

10   that he might enforce it.  And a credible threat of

11   enforcement is the legal standard.  Again, that's in the

12   Universal Life Church case.  It's discussed at great length.

13   And that case there was no reason to believe that the

14   governor would have anything to do with that.  Here, he's

15   made public statements about this specific act.

16          The attorney general and district attorney

17   general now share dual and divided responsibility for

18   enforcement of the state's criminal statutes.  If the

19   district attorney general doesn't enforce the statute

20   categorically, the duty falls to the attorney general to seek

21   the appointment of a prosecutor pro temp.  And he continues

22   to bear responsibility for that statute's enforcement at the

23   trial level in those cases.  And he always has enforcement

24   power at the appellate level.

25          So either the attorney general, the district

1    attorney general or both are a proper defendant in this case,

2    depending on the positions taken by the district attorney.

3    So it's a mixed question of fact and law which of them is the

4    proper defendant.  The same prudential concerns as I

5    mentioned would apply here to the justiciability questions

6    related to the defendants as would apply to the standing

7    analysis.

8              But in any event then, the collateral litigation

9    filed, which was admittedly filed in response to the state's

10   briefing last night.  District Attorney General Mulroy is the

11   official charged with enforcement of the statute at the trial

12   court level.  And the analysis in Universal Life Church of

13   the likelihood of enforcement, the threat of enforcement

14   applies here too.

15             He has not -- District Attorney General Mulroy

16   has not disavowed the statute's constitutionality formally.

17   Just as in that case, he has the constitutional and statutory

18   obligation to enforce the statutes of the State of Tennessee.

19             Unlike in other jurisdictions where district

20   attorneys general have given categorical assurances that they

21   won't enforce certain laws that they deem unconstitutional.

22   District Attorney Mulroy has consistently taken the position

23   that he won't give any categorical assurances about not

24   enforcing any statute duly enacted by the legislature.  He's

25   said that every time he's been asked about any statute.  And

1    he said that here as well.  And I think it's simply the fact

2    that he understands his constitutional obligation to be to

3    enforce the laws of the State of Tennessee, not to make the

4    laws of the State of Tennessee.

5             And the district attorney's office of Shelby

6    County does have a long track record of prosecuting both

7    criminal and nuisance cases under the adult-oriented business

8    statutes that Section 1407 purports to incorporate by

9    reference.  You'll find all of those factors are the elements

10   that the Sixth Circuit relied on in the Universal Life Church

11   case that is at issue here.

12            Okay.  Now, turning to the substance of the

13   statute itself, the legislature has sought to regulate a

14   subcategory of speech, based on the speaker's identity and

15   the content of the speech itself.  This is no different from

16   a public university choosing to only regulate political

17   speech made by conservative professors or to prohibit

18   only theatrical productions put on by blue-haired women's

19   studies majors.  You can't regulate a subcategory of speech

20   based on who the speaker is and what their viewpoints might

21   be.

22            The fact that the government claims that the

23   speech in question is harmful or even specifically harmful to

24   children does not save it from strict scrutiny under the

25   Supreme Court's holding in Reno versus the ACLU.  Speech we

1  don't like is still subject to First Amendment protection

2  because we cannot defend the right of honest, reasonable

3  discourse among citizens to debate political, social,

4  artistic and scientific issues of importance by waiting until

5  on idea or speaker that the majority agrees is important is

6  attacked.

7              H. L. Mencken said, "The trouble with fighting

8  for human freedom is that one spends most of one's time

9  defending scoundrels.  For it is against scoundrels that

10 oppressive laws are first aimed, and oppression must be

11 stopped at the beginning if it is to be stopped at all."

12 Friends of George's are not scoundrels.  Not even remotely.

13             But in order to ensure their right to expression

14 is protected, they are forced to defend the rights of people

15 that the legislature would seek to paint as scoundrels.

16 People that it claims that are engaging in performances

17 harmful to children.  The state has for many decades now

18 successfully protected children from the types of sexual

19 content that this statute purports to regulate through a

20 narrowly tailored scheme of obscenity statutes,

21 adult-oriented business regulations and indecent exposure

22 laws.  This statutory scheme has been so successful that when

23 asked by a reporter for an example of what HB9 was protecting

24 children from, Governor Lee could not name one single

25 incident.

1    That alone should let the Court know that

2  enjoining this statute from taking effect pending a trial on

3  the merits will work no harm to anyone.  But it will mitigate

4  the disastrous chilling affect that has made performers

5  ranging from drag troops to Nashville professional musicians

6  uncertain of whether their performances are crimes, if they

7  are done in any place that a person who is 17 years old and

8  364 days might view them, even if that person has parental

9  accompaniment, parental consent.  Even if it's viewed

10  accidentally and even without the performer engaging in any

11  commercial activity at all.  All of those factors I just

12  mentioned and more are the types of narrow tailoring present

13  in the adult-oriented business statute that 7-51-1407

14  purports to reference for its definition of harmful to

15  minors.

16    Plaintiffs take issue with aspects of that

17  definition, which has never been challenged in federal court.

18  But by removing it from the context of constitutionally sound

19  time, place and manner restrictions, the narrow tailoring to

20  ensure that the rights of parents are protected, its

21  limitation to commercial activity.  In this case the

22  legislature has gone too far and swept up constitutionally

23  protected expressive activity.

24    The statute lacks this type of careful tailoring

25  because it is, after all, a political stunt.  And it's the

1    most dangerous kind of stunt.  It's a stunt that will harm

2    the unwary bystander.  It was not carefully planned.

3           The legislature made no legislative findings to

4    determine how children were not adequately protected by the

5    existing statutory scheme.  And thus they cannot

6    demonstrate -- and it is their burden to demonstrate this.

7    They cannot demonstrate that this protects a compelling

8    governmental interest.  That's the first step they have to

9    take.

10          But then they have to show under Reno versus the

11   ACLU and Ashcroft versus the ACLU, both statutes which dealt

12   with Congress's faltering efforts to regulate Internet

13   pornography that they've got to show that these -- that the

14   statute they are enacting is superior to the statutes that

15   already exist.  They've got to demonstrate the compelling

16   government interest.  And then they've got to show how the

17   statutes they're enacting are more narrowly tailored than the

18   ones that already exist or conversely, why those narrowly

19   tailored statutes that are already on the books don't do the

20   job sufficiently.

21          And we know they can't do that because they

22   didn't even bother to do the legislative legwork to

23   demonstrate that this was necessary at all.  The bill's

24   sponsor made clear what they really wanted to regulate.

25   Representative Chris Todd stated over and over on the House

1   floor and in the media to anyone who would listen that he was

2   trying to criminalize conduct like that which had been

3   proposed in his district, which is Jackson, last year.  And

4   that was a drag show featuring performers in full-length

5   dresses and gowns doing vetted musical and comedy content

6   that would be appropriate for all ages.  He specifically

7   stated that drag content was never appropriate for children.

8   That it could not be appropriate for children.

9          The bill's Senate sponsor also referenced a drag

10  show at Tennessee Tech as the type of conduct that would be

11  prohibited.  And that likewise fell completely and

12  unambiguously within the realm of constitutionally protected

13  speech.  Now, apparently somebody suggested that it might be

14  a problem that they were sweeping all of this First Amendment

15  protected content up into their definition of harmful to

16  minors content.

17         So when asked on the House floor at the very end

18  of the debates whether the regulation would prohibit

19  family-friendly drag shows.  Asked specifically about

20  family-friendly drag shows, he then declined to answer,

21  stating that it was not up to him, the bill's primary author

22  and sponsor, to say what kind of conduct the bill prohibited.

23  If he doesn't know, no one can.  And that was precisely the

24  point.  The bill is designed to chill the speech of drag

25  performers anywhere and everywhere that is not in the back of

1   a dark, smoky bar with blacked-out windows, which is the only

2   place that the bill sponsors imagine drag performers belong

3   at all.

4          If this bill does not criminalize all

5   performances by male and female impersonators, which is one

6   perfectly plausible reading of this statute, its purpose is

7   to be so ambiguous that it would create a kind of

8   self-censorship that the First Amendment prevents them from

9   achieving through direct legislation.

10         Fortunately, the First Amendment prohibits that

11  too because the Supreme Court has been clear that a

12  government may not regulate speech in a manner that is not

13  content neutral.  It may not regulate speech in a non

14  content-neutral manner, even if that speech would otherwise

15  be unprotected by the First Amendment.  Specifically

16  including obscenity and true threats.  And we'll get to that

17  in detail in a second.

18         I do want to emphasize that this speech is

19  protected by the First Amendment because it is not defined

20  narrowly within the confines of true obscenity.  And it

21  doesn't make any reference to true threats, and it further --

22  it excises it from the realm of commercial speech, which is

23  another category of potentially less protected speech.

24         So by putting this regulation in place that could

25  follow people into their homes or in private events, anywhere

1    that a minor might see, they've stripped it of that category

2    of -- well, they have restored the First Amendment to that

3    category of protection rather than stripping it because it's

4    not commercial speech anymore.

5            It no longer merely applies to obscenity because

6    obscenity is a test that applies to the world at large.

7    There is no obscenity test just for minors.  There is a

8    compelling government interest in protecting minors from

9    obscenity.  But when you start regulating speech that is

10   inappropriate only for minors, and that's what the definition

11   of harmful to minors does, you've now moved into the realm of

12   speech that is not, per se, obscenity.  And it's got to be

13   narrowly tailored.

14           And it's not as though the legislature doesn't

15   know how to do that.  They've done it with the adult-oriented

16   business statutes.  They've done it with obscenity statutes.

17   They've done it with indecent exposure statutes.

18           So emphasizing that this speech is protected by

19   the First Amendment, I want to go back to addressing those

20   outer limits where speech isn't even protected by the First

21   Amendment.  In R.A.V. versus City of St. Paul, the court

22   addressed itself to a case involving a burning of a cross on

23   the lawn of an African-American family.  And in its very

24   detailed analysis, in a majority opinion written by Justice

25   Scalia, the court delved into the regulation of speech of

1  non First Amendment protected speech on a content and

2  viewpoint discriminatory basis.

3          R.A.V. stands for the proposition that states may

4  only regulate subcategories of otherwise prescribable speech

5  when it does so without reference to the content of the

6  speech itself or the viewpoint expressed in the speech.

7  Justice White wrote a concurrence in R.A.V., and he accused

8  the majority in that case of creating a doctrine of

9  underinclusiveness.  Essentially he said that, of course, we

10 all get what overbreadth is and why we don't want to regulate

11 speech in an overbroad fashion because you might sweep up

12 protected speech.  But what's the problem, he says, with

13 regulating only subcategories of unprotected speech?  Hate

14 speech is so noxious, he said that we ought to be able to

15 regulate it when it rises to the level of true threat.

16         Justice Scalia had some particularly sound

17 retorts to that point.  He said writing for the majority he

18 rejected that characterization.  Said the majority and the

19 majority reason that governments may regulate those subsets

20 of speech, insofar as they're regulating something like the

21 medium in which that speech is conveyed, say speech over a

22 telephone versus speech through the mail.

23         And they can regulate subsets of speech when they

24 apply to, say, different categories of businesses.  But there

25 are some limits, and they are all related to the viewpoint

1   and the content of the speech.  A myriad of examples.  I'm

2   just going to read these as direct quotes because I don't

3   think I can do any better.

4          These are direct quotes from the majority

5   opinion.  Quote, A state might choose to prohibit only that

6   obscenity which is the most patently offensive in its

7   prurience, i.e., that which involves the most lascivious

8   displays of sexual activity.  But it may not prohibit, for

9   example, only that obscenity which includes offensive

10  political messages.

11         This is the next quote.  The federal government

12  can criminalize only those threats of violence that are

13  directed against the president, since the reasons why threats

14  of violence are outside the First Amendment, protecting

15  individuals from the fear of violence, from the disruption

16  that fear engenders and from the possibility that the threat

17  and violence will occur have a special force when they are

18  applied to the person of the president.

19         But the federal government may not criminalize

20  only those threats the president -- against the president

21  that mention his policy on aid to inner cities.  And to take

22  a final example, this is a direct quote, one mentioned by

23  Justice Stevens.  A state may choose to regulate price

24  advertising in one industry but not in others because of the

25  risk of fraud.  One of the characteristics of commercial

20

1   speech that justifies depriving it of full First Amendment

2   protection is in its view greater there.  But a state may not

3   prohibit only that commercial advertising that depicts men in

4   a demeaning fashion.  Likewise, the state may not

5   discriminate between types of speech that depict men in

6   dresses.  The statute is unconstitutional, and this Court

7   should enjoin it from taking effect pending further hearings

8   on this matter.

9           **THE COURT:**  All right.  Thank you, Mr. Timmons.

10  I left something in my office.  So give me one minute.  I'll

11  be right back.

12          (Break.)

13          **THE COURT:**  It seems to me that Mr. Newsom, I

14  suppose, from your team, we should hear from you.  But might

15  make more sense to hear from Mr. Mulroy's office to see if

16  they're ready to take a position on this statute.

17          **MR. NEWSOM:**  Yes, Your Honor.

18          **THE COURT:**  All right.

19          **MR. MULROY:**  Thank you, Your Honor.  Good

20  afternoon.

21          **THE COURT:**  Good afternoon.

22          **MR. MULROY:**  Steven Mulroy, district attorney for

23  the 30th Judicial District, Shelby County.  I want to make

24  clear today that I am representing myself in my individual

25  capacity, and I was informed by the attorney general earlier

UNREDACTED TRANSCRIPT

1  that they are representing me in my official capacity.  For

2  purposes of this hearing, I will take them at their word.

3          I only want to speak to one matter today, Your

4  Honor.  The only matter that I think has to be decided today

5  is whether a TRO should be entered.  I just want to make

6  clear on behalf of -- I will not oppose the entry of a TRO.

7  I am aware of the fact that there is -- and I was just

8  served, by the way, in this matter.  So there are limits to

9  what I am prepared to talk about.

10          But I am prepared to say that I don't oppose the

11  TRO.  I am aware of the fact that there is great uncertainty

12  and great concern among the people in Shelby County regarding

13  the scope, the applicability, the validity of the statute.

14          And I believe that it would be useful, for my

15  purposes anyway, to get that uncertainty resolved.  Regarding

16  the exact scope and applicability and validity of the

17  statute, it would be useful to have it resolved before I make

18  any decisions regarding enforcement.  I understand that this

19  Court may end up deciding that the statute is completely

20  valid, completely invalid, partially invalid and may apply a

21  narrowing construction or a clarifying construction, any of

22  which would be useful for me to know before I begin to

23  enforce the statute.

24          I will just say this, that it strikes me that

25  without taking any definitive position regarding the

UNREDACTED TRANSCRIPT

1  constitutionality of the statute, certainly there are some

2  nontrivial issues here.  And certainly with respect to the

3  balance of harms factor and the public interest factor, I

4  would say that they weigh in favor of granting the TRO.  And

5  that's really all I'm prepared to say this afternoon, Your

6  Honor, having just been served today.

7        **THE COURT:**  All right.  Thank you, Mr. Mulroy.

8        **MR. MULROY:**  Thank you, Your Honor.

9        **THE COURT:**  So Mr. Newsom, based on that, I take

10  it you are representing him in his official capacity.

11        **MR. NEWSOM:**  That's my understanding, Your Honor.

12  Yes.

13        **THE COURT:**  Well, it's either you or him.  I'll

14  take you that you're going to -- yes, sir.

15        **MR. MULROY:**  If I could simply to that point, you

16  know, I was just served today.  I was informed by Mr. Newsom

17  that under the applicable statute, they basically would

18  represent me in my official capacity, even if I didn't want

19  that to happen.  I've looked at the statutory language.  I

20  don't think it's crystal clear.  I haven't had a chance to

21  research it, but certainly for purposes of this hearing today

22  and this hearing today only, I'm happy to say that Mr. Newsom

23  knows more than I about that.  And so since I was able to

24  speak in my individual capacity, I think I've made my

25  position clear.

1          **THE COURT:**  Yes, sir.

2          **MR. MULROY:**  Thank you.

3          **THE COURT:**  All right.  Yes, sir.  Mr. Newsom?

4          **MR. NEWSOM:**  I appreciate General Mulroy's

5    statements.  He's most gracious.  That is our interpretation

6    of the statute that when a Tennessee official is sued in his

7    official capacity, there's a nondelegable duty on the part of

8    the attorney general's office to represent that state

9    official, that being District Attorney General Mulroy in this

10   instance.

11         Your Honor, I take it from my friend Mr. Timmons'

12   remarks that he has no proof to put on today?

13         **MR. TIMMONS:**  We filed a number of declarations

14   earlier today, inclusive of -- and the Court has copies

15   apparently.

16         **MR. NEWSOM:**  I should be more clear about that.

17   Any live proof today?

18         **MR. TIMMONS:**  I am able to put on some live proof

19   relative to those declarations, if the Court would like.

20   Given the late hour and the short fuse on this, I sort of

21   assumed that the Court would want to see initial proof today

22   and would likely set a later hearing that would be more

23   in-depth and substantive after everybody had a chance to

24   brief the matter more fully.  I am prepared to go forward

25   either way.

1          **MR. NEWSOM:**  I'll address my remarks to the

2     Court, of course.  We're here today on a prescheduled hearing

3     on the Friends of George's versus State of Tennessee Docket

4     Number 2163, Your Honor.  I may say for the record that I

5     have with me Robert Wilson and Steven Griffin with the Office

6     of the Tennessee Attorney General.

7          **THE COURT:**  Yes, sir.

8          **MR. NEWSOM:**  And it's our delight to represent

9     the State in this case today.

10          Preliminarily, I will say that my friend

11     Mr. Timmons has a broad view of the statute, which the State

12     does not share.  As a matter of fact, the case of Miller

13     versus California from which is -- from which much of the

14     statutory language is drawn in this instance makes it clear

15     that obscene material is not protected by the First

16     Amendment.  And while my mother may wish to wash my mouth

17     out, I may go into a bit of what the statutory language says

18     that would advise the Court that the acts that are prohibited

19     to be done as harmful to minors in their presence are obscene

20     acts, which are well within the government's power to

21     regulate, Your Honor.

22          Let me first take up some of the issues that

23     relate to standing in regard to the first case.

24          **THE COURT:**  Now real quick.

25          **MR. NEWSOM:**  Yes, Your Honor.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  I'm sorry.  When you say that Miller

2     versus California, that this statute follows Miller versus

3     California, is that when it references Tennessee's Obscenity

4     Statute 39-17-901?

5          **MR. NEWSOM:**  In part, yes, Your Honor.  Because

6     as we look at the statute that has been enacted by the

7     legislature but is not yet in effect, there are various

8     borrowing provisions in the statute that refer to other

9     provisions of Tennessee statutes that precede the enactment

10    of this statute.  So when you take all those together as a

11    piece, you see the conduct that the statute intends to

12    regulate.

13         **THE COURT:**  Yes, sir.

14         **MR. NEWSOM:**  And taking all that together, there

15    has been no statement by Mr. Timmons nor is there any proof

16    in the record that indicates that the performers of the

17    Friends of George's intend to undertake acts that would

18    violate the statute.  And so Your Honor, while one might talk

19    about Miss Piggy all day long, we don't view Miss Piggy as

20    being in violation of the statute, even if it goes into

21    effect if she were to appear at the barbecue festival.  And

22    so there are the harms that are being proposed by the

23    plaintiff here, we think are not existent as far as the

24    statute is concerned.

25              The statute makes it an offense for a person to

1  perform adult cabaret entertainment, either on public

2  property or in a location where the adult cabaret

3  entertainment could be viewed by a person who is not an

4  adult.  Adult cabaret entertainment, for purposes of the

5  statute, is defined as a single or multiple adult-oriented

6  performances that are harmful to minors as that term is

7  defined in 39-17-901 and that feature topless dancers, go-go

8  dancers, exotic dancers, strippers, male or female

9  impersonators or similar entertainers.  A performance is

10 harmful to minors where the quality of any description or

11 representation in whatever form of nudity, sexual excitement,

12 sexual conduct, excess violence or sado-masochistic abuse

13 would be found by the average person applying contemporary

14 community standards to appeal predominantly to the prurient,

15 shameful or morbid interests of minors.  Is patently

16 offensive to prevailing statutes -- standards in the adult --

17         THE COURT:  Mr. Newsom, what are you reading from

18 right now?

19         MR. NEWSOM:  This is from the statute itself from

20 2003 public chapter Number 2, if Your Honor has that before

21 you.  And as a matter of fact, I might, if I could use -- do

22 you still call it the Elmo?

23         THE COURT:  We do.  And we use it every day.

24         MR. NEWSOM:  Go there and we can walk through

25 this, Your Honor, because I think it would be helpful to the

27

```
 1    Court.  I may need some coaching on this.

 2              THE COURT:  It's pretty self-explanatory.

 3              MR. NEWSOM:  We're going to zoom it up a little

 4    bit.  That's the wrong way.  All right.

 5              So the statutory language is -- and should I have

 6    my -- you can hear me, I'm sure.

 7              THE COURT:  Yes, sir.  There's a microphone.

 8    That gray bar up here on the podium right there is a

 9    microphone.

10              MR. NEWSOM:  Great.

11              THE COURT:  You're good.

12              MR. NEWSOM:  So this statute will become part of

13    7-51-1401, of course, if the Court allows it to go into

14    effect.  And as I was saying, adult cabaret entertainment

15    means adult-oriented performances that are harmful to minors

16    as that term is defined in 39-17-901.  And if we turn to --

17              THE COURT:  Right.  And that's the statute that

18    goes back to the Miller versus California standard.

19              MR. NEWSOM:  Correct.  Yes, Your Honor.

20              THE COURT:  Okay.

21              MR. NEWSOM:  And so if we go there, we talk about

22    nudity by showing the human male or female genitals, pubic

23    area or buttocks with less than a fully opaque covering.  And

24    let me -- just so I can display that.  Do you want me to

25    display that, or would that be helpful to the Court?
```

1          **THE COURT:**  No.  I thought that's what you were

2   reading from.

3          **MR. NEWSOM:**  Correct.

4          **THE COURT:**  Because I was reading along with

5   7-51-1401, and the obscenity statute covers quite a bit.

6          **MR. NEWSOM:**  Yes, it does.

7          **THE COURT:**  You were about to read all the

8   different ways --

9          **MR. NEWSOM:**  And I don't think you need that,

10  Your Honor.

11         **THE COURT:**  I would rather you didn't.  But the

12  reason I'm asking you this question is because I was struck

13  by how scientific the verbiage was.  And it covers what it

14  covers, right?

15         **MR. NEWSOM:**  Correct.

16         **THE COURT:**  As they say at the Supreme Court,

17  you'll know it when you see it.

18         **MR. NEWSOM:**  That's right.  And what one of the

19  sponsors of the legislation may have said or wanted but

20  didn't end up in the language of the statute is really of no

21  moment to the Court.

22         **THE COURT:**  But my question is really, so why do

23  we need this statute?  If what you were about to read covers

24  what it covers, why do you need to then go in and talk about

25  what this statute covers?

29

1          **MR. NEWSOM:**  Because, Your Honor, the legislative

2   intent is that this applies to a circumstance in which minors

3   are exposed to that conduct.

4          **THE COURT:**  Well, you just said we didn't need to

5   worry about the legislative intent.

6          **MR. NEWSOM:**  Well, it's -- I'm sorry.

7          **THE COURT:**  But I guess my question called for

8   it, but go ahead.

9          **MR. NEWSOM:**  The legislative intent as reflected

10  in the statute is certainly something that this Court should

11  consider.

12         **THE COURT:**  Okay.  All right.  But some would

13  argue that obscenity as defined already --

14         **MR. NEWSOM:**  Yes.

15         **THE COURT:**  -- protects minors, doesn't it?

16         **MR. NEWSOM:**  Certainly you could make that

17  argument.  I think that it does.  And I wouldn't shirk from

18  that, but I think that --

19         **THE COURT:**  So what else does this statute cover

20  that obscenity doesn't cover?

21         **MR. NEWSOM:**  Your Honor, it's right on -- nothing

22  really.  But it's not broad as my friend Mr. Timmons would

23  like to describe it so as to -- as he does not tell us by way

24  of any proof that he has put in the record that there is a

25  perform er who is associated with Friends of George's who

1   intends to include these aspects as a portion of their

2   performance or their entertainment.

3          So Your Honor, going back to the question of

4   standing, and if I may retreat back to my other position.

5          **THE COURT:**  Sure.

6          **MR. NEWSOM:**  That would be easier on me.  That we

7   really do have a circumstance in which a TRO would be

8   inappropriate because the plaintiffs have failed to show a

9   likelihood of success on the merits in that a plaintiff who

10   cannot demonstrate that standing is present is not in a

11   position to come in and ask this federal court to provide

12   relief.

13          **THE COURT:**  And you're saying they don't -- they

14   lack standing because there's no one that's part of the

15   Friends of George's that plans to put on any obscene

16   material?

17          **MR. NEWSOM:**  There's no injury in fact, as the

18   language of the cases say, that's concrete and

19   particularized.  That's actual or imminent and not

20   conjectural or hypothetical and that's in Spokeo as

21   referenced in our brief and other cases as well.  The

22   threatened injury to be an injury in fact must be certainly

23   impending to constitute injury in fact.  And allegations of

24   possible future injury are not sufficient.

25          **THE COURT:**  Well, and that may hold true,

1    Mr. Newsom, but this is a criminal statute.  I mean, you

2    know, so we're just supposed to eat the mushrooms and wait to

3    find out if they're poisonous or not?

4              **MR. NEWSOM:**  No, Your Honor.

5              **THE COURT:**  Is that the approach?

6              **MR. NEWSOM:**  Well, there's -- I cannot come in

7    and ask this Court for an advisory opinion with regard to any

8    claim that I have that's purely conjectural and doesn't pose

9    to me a likelihood of injury in fact.  The complaint is

10   almost devoid of factual allegations by which there's any

11   assertion that the production set to begin on April the 14th

12   or in fact any other performance will involve adult cabaret

13   entertainment that involves these aspects that we've been

14   discussing, nudity, sexual excitement, sexual conduct, excess

15   violence or masochistic or sado-masochistic abuse, as those

16   terms are defined in the statute.  Nor, Your Honor, even if

17   the plaintiff had asserted a proper injury, those injuries

18   are not fairly traceable, of course, to the governor or the

19   attorney general, who Mr. Timmons wishes to keep on as

20   defendants in this matter.

21              Of course, DA Mulroy has the ability to enforce

22   the statute, and as Mr. Timmons had indicated, has the duty

23   to enforce the statute should there be a violation of the

24   statute, apart from his personal misgivings about the

25   constitutionality of the statute, we would assert.  And

1    finally, there is no redressability.  The plaintiff must

2    plead facts sufficient to establish that the Court is capable

3    of providing relief that would redress the alleged injury.

4              Here the plaintiff has not shown that it has an

5    injury fairly traceable to the governor or to the attorney

6    general.  And no remedy applicable to those defendants, be it

7    an injunction or a declaration, would redress their alleged

8    injuries.  Now, Your Honor, with regard to General Mulroy --

9    and, of course, when this matter was set, we all -- all we

10   had on our plate was the original lawsuit.

11             The second lawsuit was filed this morning.

12   And -- but we assert, Your Honor, that there is no basis on

13   which even naming DA Mulroy gives this Court a basis on which

14   to find that there is standing for the reasons that I've

15   mentioned previously.  And that even the addition of General

16   Mulroy to this case does not get them over the line because

17   this statute regulates, as we've discussed, obscene conduct

18   that is not protected by the First Amendment.

19             Your Honor, the plaintiff also asserts that First

20   Amendment challenges are subject to a different set of

21   prudential concerns, and thus a different test for standing

22   applies because they contend that the statute is overbroad in

23   their regulation.  They rely mostly on Secretary of State of

24   Maryland versus Joseph H. Munson Company for the proposition

25   that any party sufficiently concerned with the chilling

1    effect that a speech regulation might have may challenge the

2    speech.

3              But to the extent that plaintiff claims that it

4    does not have to show Article III standing, that is

5    incorrect.  The Sixth Circuit in Prime Media, Incorporated

6    versus City of Brentwood, 485 F.3d 343, it's a 2007 Sixth

7    Circuit case concluded that no plaintiff can litigate a case

8    in federal court without establishing constitutional standing

9    under Article III.  And that is an injury that is fairly

10   traceable to the defendant's alledgedly unlawful conduct, and

11   that is likely to be redressed by the requested relief.

12             Overbreadth challenges allow a plaintiff to

13   attack the constitutionality of a law, not because of their

14   own rights of free expression but because the law's very

15   existence may cause others to restrain -- refrain from

16   constitutionally protected speech or expression.  Overbreadth

17   challenges are an exception to the prudential standing

18   requirement that a party may only assert a violation of its

19   own rights.  And because overbreadth creates an exception

20   only to the prudential standing inquiry, the Supreme Court

21   has made clear that the injury in fact requirement still

22   applies to overbreadth claims under the First Amendment.

23             So Your Honor, since plaintiff has not

24   established an injury in fact or for that matter traceability

25   or redressability against the state, the governor -- well,

UNREDACTED TRANSCRIPT

34

1   they've admitted with regard to the state, the governor, the

2   attorney general, the plaintiff under these circumstances

3   also lacks standing, Your Honor.

4            **THE COURT:**  All right.  Thank you, Mr. Newsom.

5            Give me one second.  We have a jury that's been

6   deliberating so let me find out.  They knocked on the door.

7            **MR. NEWSOM:**  Yes, Your Honor.

8            (Short break.)

9            **THE COURT:**  All right.  So Mr. Timmons.

10           **MR. TIMMONS:**  Yes, Your Honor.

11           **THE COURT:**  Why don't I hear your response?

12  Unless -- I didn't know if there's anybody else that needed.

13           **MR. NEWSOM:**  Your Honor, I'm sorry.  I was not

14  quite through.

15           **THE COURT:**  Oh, okay.

16           **MR. NEWSOM:**  That's fine.

17           **THE COURT:**  Well, when you sat down, I thought --

18  all right.

19           **MR. NEWSOM:**  Sorry.

20           **THE COURT:**  Fire away, Mr. Newsom.  Sorry.  I

21  didn't mean to cut you off.

22           **MR. NEWSOM:**  Well, thank you.

23           I will say, Your Honor, I think that we've heard

24  from Mr. Timmons that perhaps this is also a preliminary

25  injunction hearing and perhaps it's not.  I would take the

1    position that this is not a preliminary injunction hearing

2    and the matter that is before the Court relates to the TRO

3    and agree with District Attorney General Mulroy on that

4    point, Your Honor.

5              **THE COURT:**  Okay.  Anything else?

6              **MR. NEWSOM:**  No, that's it.

7              **THE COURT:**  All right.  Mr. Timmons, I'll hear

8    your response, and then what I would like to do is maybe take

9    a short break, collect my thoughts.  Y'all have given me a

10   lot to think about, and I'm sure I have some questions that I

11   want to ask you.  But I need to think about it first.  All

12   right.

13             Yes, sir, Mr. Timmons?

14             **MR. TIMMONS:**  We'll take -- one of the lovely

15   things about litigating these things with such little notice

16   is that we all learn about new cases that the others are

17   going to rely on as we go.  And so to that end, I've only

18   just had the opportunity to read as much of the Sixth Circuit

19   case Prime Media versus City of Brentwood, on which

20   Mr. Newsom just relied as I can.  And I think the Court

21   really just hit the nail on the head right out of the gate

22   when you said this is a criminal statute.  That's a media

23   licensing statute.  The issue there was whether -- something

24   to do with height limits.  And something to do with -- this

25   is not a criminal statute at all.

1      This has to do with whether somebody can obtain a

2  license.  And if they haven't tried to apply for the license

3  or they're not affected by a licensing statue, then the case

4  law on civil First Amendment issues is with Mr. Newsom.  But

5  the Broadrick court didn't mince words.  And it doesn't just

6  talk about prudential standing.  It does talk about

7  prudential considerations in the case.

8      But it says and I quote, As a corollary the court

9  has altered its traditional rules of standing to permit in

10  the First Amendment arena attacks on overly broad statutes

11  with no requirement that the person making the attack

12  demonstrate that his own conduct could not be regulated by a

13  statute drawn with a requisite narrow specificity.

14      Litigants, therefore, are permitted to challenge

15  a statute not because their own rights of free expression are

16  violated but because of a judicial prediction or assumption

17  that the statute's very existence may cause others not before

18  the court to refrain from constitutionally protected speech

19  or expression.

20      And to be clear, Friends of George's represents a

21  group of male and female impersonators.  Their conduct is

22  potentially regulated by the statute because they're going to

23  have to conform their conduct to the statute.  Now, what does

24  that mean?  Mr. Newsom says they haven't indicated that

25  they're going to put on -- they haven't put on evidence that

1  they intend to violate the statute.

2          Well, I don't know what the statute means.  I

3  spent two hours on the phone with a Baker Donelson attorney

4  this afternoon representing a theater organization who

5  described themselves as having to draft a "choose your own

6  adventure" flowchart to figure out what it means.  When I

7  looked at the performances from Miss Piggy, I was convinced

8  that just about every photo I saw either came close to or

9  did, in fact, violate the statute.  But Mr. Newsom doesn't

10 think so.

11         The statute is not narrowly tailored.  It is

12 vague.  It is overbroad.  And it is presumptively

13 unconstitutional.  That's another point I want to come back

14 to.  It is the burden of the state to demonstrate that the

15 challenge statute is constitutional, not the other way

16 around.

17         **THE COURT:**  And you're saying that because it's a

18 content.

19         **MR. TIMMONS:**  Because it's content-based statute.

20 Now, there is a field -- there is a strain of legal thought

21 that obscenity is not unprotected speech, but that it is not

22 speech and is therefore unprotected.  I wouldn't call that

23 anything close to a settled question of law.

24         But I want to go address the Miller analysis.

25 The Miller analysis, Miller versus California is not specific

UNREDACTED TRANSCRIPT

1   to minors.  It is about regulating conduct and what is fit

2   for adults.  The only case that -- and it still is, to some

3   degree, good law.

4           But the Ginsberg case that predates Miller by

5   five years is the case that says we can regulate minors

6   differently than we can adults.  But Miller comes after that.

7   And it says what obscenity is is -- and it provides the

8   familiar three-prong test.

9           Every case after that to rely on Miller and

10  Ginsberg to address speech relative to minors and the two key

11  cases are Reno versus ACLU and Ashcroft versus ACLU.  Every

12  one of those cases and all their progeny rely on strict

13  scrutiny standard.  They say this is content-based speech.

14  We're going to analyze it under the strict scrutiny non

15  content-neutral framework.

16          So the government can't save the statute just by

17  saying well, let's incorporate most of Miller and make a

18  little tweak we like.  And then well, that's close enough to

19  obscenity to save it.

20          Actually the Supreme Court had a great quote on

21  this if I can find it here.  Yeah.  Reno versus the ACLU, the

22  government really put this pretty succinctly.  The government

23  may not reduce the adult population to only what is fit for

24  children.  Regardless of the strength of the government's

25  interest in protecting children, the level of discourse

1   reaching a mailbox simply cannot be limited to that which

2   would be suitable for a sandbox.  I think we all know -- I

3   know it's a euphemism, but I think we all know that children

4   check the mail.

5           And so if the government's response to that is

6   well, we're saying you have to take this conduct and put it

7   somewhere where a minor can't possibly see it.  That's not a

8   reasonable restriction.  That's not narrowly tailored, and

9   it's ambiguous.  What does that mean?  Does that mean my

10  house?  What if somebody -- what if I'm --

11          **THE COURT:**  Is that your primary issue with it?

12  The fact that it says that the performance can't be either in

13  public or in a location where the adult cabaret entertainment

14  could be viewed by a person who is not an adult?

15          **MR. TIMMONS:**  That's one of the major issues with

16  it.  I don't know that I have a primary argument about this

17  statute because there are so many to choose from.  But the

18  fact that it is extremely vague as to where this could take

19  place is hugely problematic.  But it's by design.  It's by

20  design.  The statute is intended to again, force people back

21  to places where there's no possibility that children could

22  see this.

23          But we do take issue with the content

24  restrictions themselves as well and those definitions.  If

25  you limit those definitions to adult-oriented businesses that

1   are much more specifically defined, then perhaps they

2   survive.  But that's part of the narrow tailoring.  That's

3   part of the narrow tailoring analysis.

4         And every single one of those issues that I

5   mentioned, whether it's commercial speech, the precise nature

6   in which it is regulated, you know, the strictness of the

7   time, place and manner restrictions and the parental consent

8   issue.  The issue of whether parental consent is an

9   affirmative defense, which it is in our existing

10  adult-oriented business statutes.  And those issues are all

11  explicitly discussed in the analysis in Reno and come up

12  again in Ashcroft.

13        Let's talk about the injury in fact issue very

14  quickly.  I do understand that the state takes issue with our

15  view that Broadrick is sufficient to get us through the door

16  to the courthouse.  In Elrod versus Burns, which I haven't

17  cited anywhere, so it is 427 U.S. 347, 1976.  Right after

18  Miller.  A year after Miller, I think.  The Supreme Court

19  held that the deprivation of a First Amendment right

20  constituted an injury in fact and that it was sufficient

21  injury to establish irreparable injury for the purposes of

22  injunctive relief.  When the government passes a criminal

23  statute that quashes everybody's speech, we don't all have to

24  go out and say I intend to engage in this speech and then

25  before I can go to court and do it.  I'm sorry.  Go to court

1    and argue that I should be able to do it.

2           Let's see.  We've talked about presumptive and

3    constitutionality.

4           **THE COURT:**  Mr. Timmons?

5           **MR. TIMMONS:**  Yes.

6           **THE COURT:**  I would ask you to pause for a

7    moment.

8           (Short break.)

9           **THE COURT:**  All right.  Mr. Timmons, sorry about

10   that.

11          **MR. TIMMONS:**  No problem at all, Your Honor.  I

12   appreciate a moment to gather my thoughts.  I mentioned a

13   moment ago that the government -- because this is a

14   presumptively unconstitutional statute, the government has to

15   show a compelling government interest.  It can't just list

16   protecting children, you know, as a set of magic words to get

17   around that issue.  It's got to demonstrate how those

18   children are going to be harmed.  And the state just conceded

19   to you that this statute doesn't cover anything that wasn't

20   already illegal.  The statute does nothing according to the

21   government.

22          **THE COURT:**  So what are you afraid of?

23          **MR. TIMMONS:**  Well, I'm afraid the statute does

24   do quite a bit.  I'm afraid that it, first of all, heightens

25   the penalty available from a misdemeanor to a felony for

1   someone in one of those protected categories.  I'm sorry, not

2   one of those.  Described categories of speakers.  A male or

3   female impersonator who violates that statute is subject to a

4   misdemeanor on the first arrest but felonies for everyone

5   after that.

6          So now we're talking about depriving people of

7   their right to vote.  Branding them infamous because they

8   belong to a particular category of speaker.  And they're

9   going to violate -- when they violate a statute that they

10  admit is redundant and only applies to these specific

11  categories of speakers.  Actually a moment ago you asked me

12  what was my biggest -- I think my biggest problem with this

13  statute.  That's it.

14          **THE COURT:**  Yeah.  Okay.

15          **MR. TIMMONS:**  That's it.  We're talking about

16  turning people into felons because they belong to a specific

17  category of speaker and they violate a statute that is

18  essentially already on the books and applies at a lower

19  standard to everybody else.  That's the one that personally

20  offends me.  And I think it's also one of the most compelling

21  arguments.

22          But the state just told you that this statute

23  doesn't cover anything that wasn't already illegal.  If

24  that's actually true and if that's what the state intended,

25  you know, when I taught civil rights and constitutional law,

1   that's the example I used for helping students understand

2   what a lack of legitimate governmental interest was.  Let

3   alone a compelling governmental interest.  Passing a law that

4   they claim does nothing is -- deprives them of a compelling

5   governmental interest almost certainly.  They have the

6   obligation to show why this statute is necessary under Reno,

7   and they can't even -- they don't have any evidence to

8   support it, and they can't even answer the question.

9           Now, Mr. Newsom also indicated that it was not

10  relevant what the bill sponsor said.  There are differing

11  schools of thought on statutory interpretation.  That's fair.

12  I personally lean a little textualist.  I don't think

13  legislative bodies do a great job of agreeing on what

14  everything means.

15          However, when we're talking about this type of

16  law that's directed at a specific group of people and that is

17  directed at a category of speech, Supreme Court precedence --

18  and I'm quoting from Reed versus Town of Gilbert.  Supreme

19  Court "precedents have also recognized a separate and

20  additional category of laws that, though facially content

21  neutral, will be considered content-based regulations of

22  speech; laws that cannot be justified without reference to

23  the content of the regulated speech or that were adopted by

24  the government because of disagreement with the message that

25  the speech conveys.  Those laws, like those that are content

UNREDACTED TRANSCRIPT

44

1    based on their face, must also satisfy strict scrutiny."

2              Briefly on the issue of who the right defendant

3    is, I just want to say that our absolute best position when

4    it comes to standing or when it comes to who the right

5    defendant is rather, is the district attorney.  And it is

6    because of the Sixth Circuit case on which the state relies

7    heavily.  The Universal Life Church case goes into a deep

8    analysis of why district attorneys are proper parties to laws

9    like this that have not yet been enforced.

10             But it also goes a little bit deeper into the

11   analysis under Ex parte Young.  And I can't recall if I said

12   this earlier or not, but Ex parte Young -- and I think

13   everybody who spends a lot of time doing this field of work

14   gets a little frustrated with the idea that it is a

15   complicated legal fiction.  It is a complicated legal

16   fiction.

17             The dissent in Ex parte Young points out that

18   really this is all about suing the government over what laws

19   are constitutional.  And this distinction between individual

20   capacity or official capacity is very cerebral and academic

21   but not practical.  But that's the dissent, and that's not

22   the law.

23             Ex parte Young describes the mantle of the state

24   being on a government actor, and it describes when you move

25   into the realm of constitutionally violative statutes because

1    a state can't authorize those.  It says that that person is

2    then stripped of that mantle and then acts only in their

3    capacity as an ordinary person, their individual capacity.

4            And so the individual capacity claim against the

5    district attorney general is the claim that is most valid

6    here.  And I think when you review the Universal Life Church

7    case, you'll see that that's not merely still a good law, but

8    it's the analysis with regard to this specific group of

9    district attorneys, Tennessee district attorneys general that

10   the Sixth Circuit has already applied.

11           I do want to say one last thing about the

12   vagueness of this law because I somehow didn't work this in

13   previously.  The definition section that Mr. Newsom showed

14   you earlier that defines content harmful to minors, it also

15   defines community for the purposes of the community standards

16   test.

17           I was kind of blown away because Miller is pretty

18   clear that the community can be the state.  Miller versus

19   California, the jury instruction in Miller made the -- was to

20   tell the jury apply the community standards of the State of

21   California.  That was challenged by the -- by Miller on the

22   grounds that a national standard was appropriate.  And the

23   Court ultimately said now, you apply a community standard to

24   two parts of the analysis, but federal judges retain the

25   power to apply national standard to what has legitimate

1   artistic, political, social or scientific value.  The State

2   of Tennessee however, chose to balkanize this statute even

3   further and defined community as the judicial district in

4   which the allegations -- or the criminal act is alleged to

5   have occurred.

6            Citizens of Shelby County and the members of

7   Friends of George's and Friends of George's itself in general

8   have no notice of where in the state they can travel and

9   perform their art and what they're allowed to do in each

10  judicial district, unless they go do some sort of a public

11  opinion survey about the community standards in that

12  particular judicial district.  This is a statewide statute

13  with 32 different definitions, according to the face of the

14  statute.  And I cannot find any case on point on that issue,

15  but that seems to me to be intrinsically vague.  It certainly

16  does not put these individuals, these actors on notice of

17  what's illegal wherever they go.

18           And unless the Court has any questions, I believe

19  I've used too much of your time today.

20           **THE COURT:**  Actually, you haven't.

21           Yes, sir, Mr. Mulroy?

22           **MR. MULROY:**  Your Honor, just very quickly, I

23  have to speak at a community forum in a little while, so when

24  you retire, it may be that I will also retire, and

25  Ms. Indingaro will remain, with your permission.

UNREDACTED TRANSCRIPT

47

1          **THE COURT:**  Yes, sir.  That's fine with me, if

2     she's prepared to answer any questions.  And I don't know

3     that I would have any for you in particular.  But Mr. Newsom

4     has got your back as far as your official capacity is

5     concerned.  So all right.  Thank you.

6          **MR. MULROY:**  Thank you, Your Honor.

7          **THE COURT:**  Mr. Newsom, any quick response to

8     that before I step back?

9          **MR. NEWSOM:**  No, Your Honor.  Thank you.

10          **THE COURT:**  Okay.  Well, all right.  Y'all give

11     me a few minutes, and I'll come back and either say good-bye

12     or ask some questions.

13          (Short break.)

14          **THE COURT:**  All right.

15          **MR. NEWSOM:**  Your Honor, if I may?

16          **THE COURT:**  Yes, sir.  You've got second

17     thoughts?

18          **MR. NEWSOM:**  Well, I do.  With the benefit of

19     younger minds, I would like to revise and extend my remarks

20     just a bit.

21          **THE COURT:**  Sure.  If you don't mind using the

22     microphone.

23          **MR. NEWSOM:**  Your Honor, your question to me

24     during my presentation was what does this statute add that is

25     not in the previous acts.  And I would point out to the Court

that it does add a time, place and manner aspect to the statute that is not contained in the previous statutory scheme.

**THE COURT:** Is that in a location where an adult could be -- adult cabaret entertainment could be viewed by a person who's not an adult?

**MR. NEWSOM:** Yes, Your Honor. Together with public places as well. So I know that's belaboring the obvious, but I didn't want to leave my poorly articulated point standing --

**THE COURT:** Okay.

**MR. NEWSOM:** -- before the Court had the opportunity to explore this further. Thank you, Your Honor.

**THE COURT:** Yes, sir.

So Mr. Timmons, I want to start with you, and you've said this is -- strict scrutiny applies. It's a content-based restriction. And it may be obvious to you, but I just want you to tell me, you know, how does this regulate content? What is it about the statute?

**MR. TIMMONS:** Do you want me to answer it from here or are you going to?

**THE COURT:** It's completely up to you. There's a microphone right in front of you. No, no, no. I mean that gray bar right there is a microphone.

**MR. TIMMONS:** I guess I knew that. So there are

49

1    a couple of different ways.  First of all -- so part of

2    viewpoint discrimination relates directly to the identity of

3    the performer.  Ms. Stewart is going to find me the quote

4    here.  Yeah.  So this is Reed versus Town of Gilbert.

5    "Because speech restrictions based on the identity of the

6    speaker are all too often simply a means to control content,

7    the Supreme Court has insisted that laws favoring some

8    speakers over others demands strict scrutiny when the

9    legislature's speaker preference reflects their content

10   preference."

11              "Thus a law limiting the content of newspapers

12   but only newspapers could not evade strict scrutiny because

13   it could be characterized as speaker based.  Likewise, a

14   content-based law that restricted the political speech of all

15   corporations would not become content neutral because it

16   singled out corporations as a class of speakers.

17   Characterizing a distinction as a speaker -- as speaker based

18   is only the beginning, not the end of the inquiry."

19              So here, we know, we know who the legislature was

20   targeting.  They were very clear about it.  And here, we've

21   got a category of speakers, male and female impersonators,

22   that for obvious reason -- I mean, reasons that I hope we

23   don't have to put on a lot of proof about to persuade

24   everybody of.

25              THE COURT:  Well, but male and female

1   impersonators, that's already part of the Tennessee law under

2   these definitions, isn't it?

3           **MR. TIMMONS:**  I mean, it wasn't -- this statute,

4   first of all, changes and broadens the regulation of that

5   statute.  I did mention earlier, Your Honor, that we do take

6   issue with the constitutionality of that underlying

7   definition of harmful to minors.  I just don't think it's

8   really pertinent to --

9           **THE COURT:**  Well, so I'm looking at 7-51-1401,

10  and it references adult cabaret under the definition.  And

11  within adult cabaret includes many of the same labels that

12  are in the statute that has recently been passed.  So I guess

13  I'm just -- I'm asking you what about the statute that was

14  passed is aimed at a specific -- either specific content or a

15  specific speaker?

16          **MR. TIMMONS:**  The existing definition of adult

17  cabaret, that regulates what businesses host.  What materials

18  businesses put on the shelves.  That regulates where

19  businesses can display lewd magazines or videos.  Or

20  businesses can have performers.  It doesn't regulate

21  performers.  This takes those categories of performers that

22  are the subject matter of a regulation on businesses, and it

23  makes them the criminals.

24          **THE COURT:**  Okay.

25          **MR. TIMMONS:**  This eradicates the requirement

1    that the performance be compensated that exists in the

2    previous adult-oriented business statutes, and it says that

3    an individual person who does this -- who performs at all,

4    even just one time for no money, they're now the regulated

5    party, and they're now the criminal.

6              And they have been also deprived, I would -- and

7    this is crucial of the affirmative defense that exists in the

8    adult-oriented business and obscenity statutes of parental

9    consent.  Remember Miller -- I'm sorry.  Not Miller.  Reno

10   doesn't create a sliding scale.  Neither does Ginsberg

11   actually, predating Miller.  There wasn't a sliding scale of,

12   say, content that's appropriate for minors who are three

13   versus content for minors that are 17 years and 364 days.

14   You're either a minor or you're not.

15             And so when we think about the appropriate minor,

16   we've got to talk about who we're excluding from any kind of

17   content that would run afoul of the statute.  And that's

18   where parental consent becomes really important.  And we

19   think about these sort of age-restrictive schemes in a kind

20   of, I think, common sense way because we're all used to

21   seeing it at the movie theater, right?

22             But movies, that's self-regulated.  And if you've

23   got a parent with you and you're 17, you can go to that

24   R-rated movie.  If you've got a parent with you and you're

25   13, you can go to that R-rated movie.  And it's, again,

1    that's a self-imposed regulatory scheme by the industry.

2            The Communications Decency Act, this is out of

3    Reno.  The Communications Decency Act differs from the

4    various laws and orders upheld in those cases in many ways

5    including that it does not allow parents to consent to their

6    children's use of restricted materials; it is not limited to

7    commercial transactions; fails to provide any definition of

8    indecent and omits any requirement that patently offensive

9    material lacks socially redeeming value; neither limits its

10   broad categorical prohibitions to particular times nor bases

11   them on an evaluation by an agency familiar with the unique

12   characteristics of the regulated material.

13           So have I answered Your Honor's question?

14           **THE COURT:**  Yeah.

15           **MR. TIMMONS:**  Okay.

16           **THE COURT:**  I believe you have.  Unless there are

17   other reasons why you think it's content based, that it's a

18   content-based restriction.  The point I was getting at is

19   you're saying strict scrutiny applies, presumptively

20   unconstitutional.  And I'm about to hear from Mr. Newsom

21   about what he thinks about that.  So I just wanted to

22   understand why you think this statute applies to categories

23   of content.

24           **MR. TIMMONS:**  So two other points, and I think I

25   can make them briefly.  The first is that by taking the

1    definitions that were already extent in Tennessee law and

2    removing them from their context -- and, I mean, obviously

3    I've already talked about how it applies in different people.

4    It strips them out of their narrow tailoring.

5           So that by itself means this whole scheme has to

6    be subjected to strict scrutiny again.  That statute might be

7    constitutional.  I don't believe that that regulatory scheme

8    has ever been challenged in federal court.  I think there is

9    a pre- --

10          **THE COURT:**  When you say that statute, you're

11   talking about the adult-oriented establishments statutes.

12          **MR. TIMMONS:**  Yeah.  The section of the obscenity

13   Statute 39- -- the part in Title 39 that is cross-referenced

14   in 1407 is -- that statute has been tested only once to my

15   knowledge.  It was pre Reno.  And it was a state court case,

16   Tennessee Supreme Court case.  Davis-Kidd Booksellers versus

17   McWherter.  It's largely a case about the Tennessee

18   constitution.  There is a sort of cursory First Amendment

19   analysis.

20          But it is completely -- it is in complete

21   conflict with the subsequent Reno analysis.  And Ms. Stewart

22   has just pointed out some of this context that we're talking

23   about here.  Gosh, I didn't even realize how -- this is the

24   State's burden under Title 39 Section 17-914.

25          "The state has the burden of proving that the

1    material" -- this is material that's harmful to minors -- "is

2    displayed.  Material is not considered displayed under this

3    section if:  (1) The material is placed in binder racks that

4    cover the lower two thirds of the material and the viewable

5    one third is not harmful to minors.  Located at a height of

6    not less than five and one half feet from the floor."  I

7    think we see who they're trying to protect there.

8    "Reasonable steps are taken to prevent minors from perusing

9    the material.  The material is sealed, and it if contains

10   material on its cover that is harmful to minors, it must also

11   be opaquely wrapped.  The material is placed out of sight

12   underneath the counter, or the material is located so that

13   the material is not open to view by minors and is located in

14   an area restricted to adults."

15          This list goes on and on for a couple of pages.

16   And that is the type of narrow tailoring that I am talking

17   about being stripped away from this and replaced with an area

18   where it can't be viewed by minors.  And the State has to

19   prove all that.  Now we have a -- the State says well, this

20   was in a place that was potentially viewed by minors.  And

21   now the defendant is going to have to come forward and prove

22   that they had taken sufficient steps to prevent minors from

23   seeing it, I suppose.  The statute isn't clear.  It's vague.

24          **THE COURT:**  Okay.  Real quick.  In Reed versus

25   Town of Gilbert, you gave an example of there's two ways we

1    get to strict scrutiny.  One is if it's content-based

2    restriction.  The other is if it seems to be content neutral

3    on its face, you can look to the legislative history and see

4    if they're trying to address content.

5              And my question to you is, is that part of the

6    opinion, or is that dicta from Reed versus Town of Gilbert?

7              **MR. TIMMONS:**  So it's actually the Supreme Court

8    rejecting the appellate court's reasoning.  So the section of

9    the statute says "The Court of Appeals and the United States

10   misunderstand our decision in Ward as suggesting that a

11   government's purpose is relevant even when a law is content

12   based on its face.  That is incorrect.  Ward had nothing to

13   say about facially content-based restrictions, because it

14   involved a facially content-neutral ban on the use, in a

15   city-owned music venue, of sound amplification systems not

16   provided by the city."

17             "In that context we looked to governmental

18   motive, including whether the government had regulated speech

19   because of disagreement with its message, and whether the

20   regulation was justified without reference to the content of

21   the speech."  So the case whose holding that was is --

22             **THE COURT:**  Ward.

23             **MR. TIMMONS:**  Ward versus Rock Against Racism,

24   491 U.S. 781.  And it forms a part of a basis for Reed's much

25   more recent reasoning.

1          **THE COURT:**  I see.  Okay.  All right.

2          Mr. Newsom?

3          **MR. NEWSOM:**  Yes, Your Honor.

4          **THE COURT:**  You agree it's strict scrutiny?

5          **MR. NEWSOM:**  No, Your Honor.  We do not.  In the

6    first instance the state's position, as I've articulated it,

7    is that what we're dealing with is obscene conduct.  And as

8    much as my friend Mr. Timmons wants to generalize the conduct

9    at issue here, if we dig into the statute, the conduct that

10   is being regulated is indeed obscene.  And I don't know if I

11   should hesitate to read that conduct before the Court.

12          **THE COURT:**  Well, if you --

13          **MR. NEWSOM:**  But I think the Court has got it,

14   certainly understands that when we dig into the statutory

15   language that the underlying conduct that is at issue is

16   certainly obscene.  And just to pick out an example that is

17   not so lurid perhaps.  Excessive violence under

18   TCA 39-17-901 4, "through the depiction of acts of violence

19   in such a graphic or bloody manner as to exceed common limits

20   of custom and candor or in such a manner that is apparent

21   that the predominant appeal of the portrayal is portrayal of

22   violence for violence's sake."  Now, is that something, of

23   course, that is something that should be viewed by minors?

24   We suggest not.  Certainly not by entertainers in a live

25   performance, Your Honor.

1          But to get to the question of if this conduct is

2   protected by the First Amendment, we would submit that the

3   Court should review the case of Entertainment Productions,

4   Incorporated versus Shelby County, 721 F.3d 729.  It's a 2013

5   Sixth Circuit opinion in which the Court said, "We assess the

6   constitutionality of regulations that purport to ameliorate

7   the deleterious secondary effects of sexually oriented

8   establishments under the intermediate scrutiny standard

9   announced in City of Renton versus Playtime Theaters,

10  475 U.S. 41.  According to Renton, content-neutral

11  regulations of the place -- time, place or manner of

12  protected expression are valid so long as they are designed

13  to serve a substantial governmental interest and do not

14  unreasonably limit alternative avenues of communication."

15         So Your Honor, we reject the argument that a

16  strict scrutiny standard would apply and would insist that if

17  this is not obscene conduct that's being regulated, that the

18  intermediate scrutiny standard articulated there would be the

19  applicable standard for the Court to utilize.

20         **THE COURT:**  So is it your position then that it

21  is content neutral?

22         **MR. NEWSOM:**  It is.  It is.

23         **THE COURT:**  What about Mr. Timmons' point that,

24  you know, you pull the -- you pull these definitions kind of

25  out from the regulatory framework that's already in place

1  that is, in his words, narrowly tailored to address the

2  concerns that you're articulating, and now we've just sort of

3  cobbled together this new statute, and we throw in anywhere a

4  minor might be -- well, in a location where the adult cabaret

5  entertainment could be viewed by a person who's not an adult.

6  I mean, that's anyplace, Mr. Newsom.  I mean...

7         **MR. NEWSOM:**  I'd like to take that on, as well as

8  one of the arguments that Mr. Timmons made earlier.  And that

9  is that the legislature has an interest in regulating conduct

10  such as this.  And, of course, we do insist that it's obscene

11  conduct that is performed in the presence of minors, either

12  recklessly or with intent, which is the language of the

13  statute.

14         And so it strikes us as not at all inappropriate

15  that the legislature would determine that that conduct as

16  regards to conduct that is done in the presence of minors is

17  conduct that is deserving of criminal sanction, including

18  misdemeanor and felony consequences, Your Honor.  That that

19  is within the discretion of the legislature of the State of

20  Tennessee to regulate conduct that is obscene in nature.

21         **THE COURT:**  Well, I still go back to my question.

22  If obscenity is sort of this umbrella category that's already

23  regulated, this statute, I don't know, I'm just trying to

24  understand what it would apply to, if not to the Miss Piggy

25  context or something along those lines.  I mean, there are

1   kids running around the barbecue fest, right?

2            **MR. NEWSOM:**  Well, of course there are, Your

3   Honor.  But when you look at what the Miss -- of course the

4   Miss -- I think that what -- the State thinks that what

5   Mr. Timmons is arguing with regard to Miss Piggy is that this

6   is perhaps a cross-dresser.  That is not conduct that is made

7   illegal under this statute.

8            This statute is much more pointed.  And for

9   instance --

10            **THE COURT:**  Well, I mean, it does include male or

11   female impersonators, doesn't it?

12            **MR. NEWSOM:**  Oh, it does.  But it includes male

13   or female impersonators who, for instance, are depicting acts

14   that are intended to result in sexual excitement, meaning the

15   condition of human male or female genitals when in a state of

16   sexual stimulation or arousal.  Now, I haven't seen that at

17   the barbecue contest.

18            **THE COURT:**  Well -- okay.

19            **MR. NEWSOM:**  You can go down the line, and I

20   don't want to belabor the point with the Court, but these are

21   things that are not just a --

22            **THE COURT:**  Well, my question -- I mean, you

23   know, the sponsor of this bill was concerned about what was

24   coming to Jackson, right?  At least according to some of the

25   material we've received, there was concern about what amounts

1  to a drag show coming to Jackson.  Well, those depictions,

2  although they were, you know, clearly comical from

3  Mr. Timmons, I mean, couldn't that be construed as a drag

4  show?

5           **MR. NEWSOM:**  Your Honor, if the Court determines

6  that the legislative history is important to the Court's

7  decision, when going back and looking at the legislative

8  history, we'll see that the original sponsor of the bill was

9  informed by other legislators that his initial intent was not

10  something, of course, that the courts would accept.  And

11  steered the sponsor back to look at the authorities that

12  provide guidance to the legislature in attempting to regulate

13  conduct.  So the sponsor's original concept as perhaps

14  reflected by a lawsuit --

15           **THE COURT:**  He should have kept his powder dry,

16  is that?

17           **MR. NEWSOM:**  Well, you know, I'm sure I've said

18  things that I've lived to regret, Your Honor.  But I think --

19           **THE COURT:**  Not you.

20           **MR. NEWSOM:**  -- when you look -- if you think

21  it's important to look at the legislative history in context,

22  I think what the Court is going to find is that the sponsor's

23  original idea was refined greatly before the statute was

24  enacted in the legislature.

25           **THE COURT:**  Okay.  All right.

UNREDACTED TRANSCRIPT

1          Mr. Timmons, you've included the governor in your

2     lawsuit.  As I understood Universal Life and I haven't

3     memorized it, but I think one of the things it said was that

4     the take care clause was not enough for federal jurisdiction

5     over the governor.  So what basis is there for us to have the

6     governor in this case?

7          **MR. TIMMONS:**  Your Honor, this is where I say

8     that those prudential concerns that apply only to free speech

9     cases that relate to overbreadth come into play.  I think

10    that under that -- in any other First Amendment case, no

11    doubt, the governor's take care power is not sufficient.

12    However here, he's made statements that indicate a credible

13    threat of enforcement.  And that he does have the power to do

14    it.  And here we have those other prudential concerns.

15          Can I address two points Mr. Newsom made real

16    quick?

17          **THE COURT:**  Sure.

18          **MR. TIMMONS:**  I'm just going to go to cases that

19    he cited because there are some problems with those

20    citations.  First, he quoted you the definition of excess

21    violence.  That Davis-Kidd case that I mentioned earlier, one

22    of the very few things that the Court actually managed to do

23    in the Davis-Kidd case was hold that definition of excess

24    violence exceeded the scope of what was permissible to

25    regulate under the Miller test and was unconstitutional.  So

1    just to be clear, that case, that part of the statute, that's

2    not what we're talking about here.

3              The second thing that Mr. Newsom relied on is the

4    case Entertainment Productions versus Shelby County, which

5    was about Shelby County's strip club regulations or rather,

6    the Tennessee statutory scheme on which Shelby County

7    predicated those.  The problem with that is that the whole

8    case was about that context that I was talking about.  It

9    goes to intermediate scrutiny because they're regulating the

10   ancillary effects of strip clubs.

11             When Mr. Newsom talked about ancillary effects,

12   that's not the direct effects of speech.  That's the other

13   stuff that happens around strip clubs.  Prostitution, drug

14   use, drug sales, violent crime, car break-ins.  That's the

15   ancillary effects that cities and states have the power to

16   regulate when they talk about the location of strip clubs.

17   That's what lowers the scrutiny from strict to heightened,

18   and the context and the nature of the tailoring is what that

19   whole case was about.  So you can't just say, well, once upon

20   a time, the Sixth Circuit looked at these definitions in a

21   totally different context and applied a different standard to

22   them.

23             And here's the language.  This is some great

24   language from Entertainment Productions.  It was made clear

25   that if an "adult entertainment sweeps in mainstream artistic

UNREDACTED TRANSCRIPT

63

1    performances and if the presentation of a single performance

2    suffices to subject an establishment to the Tennessee act,

3    then the act applies to precisely the set of establishment

4    that doomed the statutes noted earlier." Doomed. That's the

5    Sixth Circuit, which were invalidated by this and other

6    circuit courts.

7              The statute at issue explicitly takes it from an

8    establishment that is an adult cabaret and says that an adult

9    cabaret performance is anything that anybody does that meets

10   these definitions in any place that could be viewed by a

11   minor one time. Even without compensation. I also do not --

12   Mr. Newsom said that there's a mens rea requirement of

13   recklessly here.

14             I don't have that section of the statute in front

15   of me, and I have to confess there have been so many versions

16   of this law that I get them confused sometimes. But I don't

17   recall there being a written intent or recklessness

18   requirement in the statute. And if the state's asking you to

19   imply one, then we're already out of the bounds of void for

20   vagueness.

21             **THE COURT:** Well, that raises a good point. I

22   want to make sure that I'm looking at the right version of

23   this law. I was looking at document -- it's -- in our docket

24   system it's Document 19-1. It's Exhibit A. Public chapter

25   Number 2. Senate bill Number 3.

```
1              MR. NEWSOM:  That's it, Your Honor.

2              THE COURT:  Okay.  All right.  So everybody

3   agrees that that's what I should be looking at.  I didn't see

4   a mens rea in there either.  What did I miss?

5              MR. NEWSOM:  Excuse me just a second, Your

6   Honor --

7              THE COURT:  Sure.

8              MR. NEWSOM:  -- if I may.

9              Your Honor?

10             THE COURT:  Here we go.

11             MR. NEWSOM:  Sorry.  The mens rea requirement is

12  contained in a more general statute, which is at

13  TCA 39-11-301(c).  Where there's the requirement that an act

14  be performed intentionally, knowingly or recklessly.  That's

15  the citation, Your Honor.

16             THE COURT:  All right.  And that's somehow tied

17  in with this statute?

18             MR. NEWSOM:  Yes, Your Honor.

19             THE COURT:  Okay.  All right.  All right.

20             Did you want to respond?

21             MR. NEWSOM:  Just real briefly, Your Honor.  Your

22  Honor asked the question about the governor.  And I think

23  that this would apply to General Skrmetti as well.  And the

24  law is that to establish redressability, a plaintiff must

25  plead facts sufficient to establish that the Court is capable
```

UNREDACTED TRANSCRIPT

65

1   of providing relief that would redress the alleged injury.

2                   And since plaintiff has not shown that it has an

3   injury fairly traceable to the governor or to the attorney

4   general, no remedy applicable to those defendants, be it an

5   injunction or a declaration, would redress plaintiff's

6   alleged injuries.  And there I refer to the more recent case

7   of R.K. ex rel. J.K. versus Lee, which is 53 F.4th 995 at

8   1001.

9           **THE COURT:**  While I've got you, you mentioned the

10  Entertainment Productions versus Shelby County.

11          **MR. NEWSOM:**  Yes, Your Honor.

12          **THE COURT:**  721 F.3d and then I didn't get the

13  page number.

14          **MR. NEWSOM:**  I apologize.

15          **THE COURT:**  No, I just didn't write fast enough.

16  Go ahead.

17          **MR. NEWSOM:**  It's 729, Your Honor.

18          **THE COURT:**  Okay.

19          **MR. NEWSOM:**  It's a 2013 case.

20          **THE COURT:**  All right.  Well, so I've got a lot

21  to think about.  And I appreciate y'all's hard work and quick

22  response.  And so you've given us a lot to chew on.  I will

23  try to get an order out just as soon as humanly possible, and

24  then we'll take it from there.  Okay?

25          **MR. NEWSOM:**  Thank you, Your Honor.

UNREDACTED TRANSCRIPT

1            **THE COURT:**   Thanks everybody.   Y'all have a good

2    rest of your evening.

3            (Adjournment.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

67

**C E R T I F I C A T E**

I, CANDACE S. COVEY, do hereby certify that the foregoing 67 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the Oral Arguments hearing on the 30th day of March, 2023, in the matter of:

Friends of George's, Inc.

vs.

The State of Tennessee, et al.

Dated this 3rd day of April, 2023.

S/Candace S. Covey

CANDACE S. COVEY, LCR, RDR, CRR
Official court reporter
United States District Court
Western District of Tennessee

UNREDACTED TRANSCRIPT